Electronically FILED by Superior Court of California, County of Los Angeles on 11/04/2022 03:20 PM Sherri R. Carter, Executive Officer/Clerk of Court, by G. Carini, Deputy Clerk

Azar Mouzari, SBN 263461
Nilofar Nouri, SBN 311871
**BEVERLY HILLS TRIAL ATTORNEYS, P.C.**
468 N. Camden Drive, Suite 238
Beverly Hills, California 90210
Tel: 310-858-5567 Fax: 424-286-0963
Email: azar@bhtrialattorneys.com
Email: nilofar@bhtrialattorneys.com

Attorneys for Plaintiffs

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| STACIA CULLORS, an individual; ERIC EBERLE, an individual; MAGGIE HARRISON, an individual; NICOLE SCURLOCK DEWEY, an individual; MERCEDES SCHROEDER, an individual; PATRICIA ANNE CRAWFORD, an individual, and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>vs.<br><br>CEREBRAL, INC., and DOES 1 through 10 inclusive,<br><br>              Defendants. | Case No.: 22STCV35155<br><br>**COMPLAINT FOR DAMAGES**<br><br>**(1) BREACH OF CONTRACT**<br>**(2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>**(3) PROFESSIONAL NEGLIGENCE**<br>**(4) FRAUDULENT CONCEALMENT AND MISREPRESENTATION**<br>**(5) VIOLATION OF THE BUSINESS & PROFESSIONS CODE SECTIONS 17200 ET SEQ. ("UCL")**<br>**(6) UNJUST ENRICHMENT**<br>**(7) VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW – DECEPTIVE PRACTICES** |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS…………………………………………………...............……..2

INTRODUCTION………………………………………………………..…….....3

PARTIES………………………………………………………………………......4

     I.    Plaintiffs……………………………………………......………4

     II.    Defendants…………………………………………..………5

JURISDICTION AND VENUE…………………………………………...…………5

GENERAL ALLEGATIONS…………………………………………..…………5

CLASS ACTION ALLEGATIONS………………………………….....…………17

CAUSES OF ACTION……………………………………………….....…………21

     COUNT I: BREACH OF CONTRACT…………………………..………21

     COUNT II: BREACH OF COVENANT OF GOOD FAITH AND FAIR

     DEALING…………………………………………………….....………22

     COUNT III: PROFESSIONAL NEGLIGENCE…………………..………22

     COUNT IV: FRAUDULENT CONCEALMENT AND MISREPRESENTATION…23

     COUNT V: VIOLATIONS OF THE BUSINESS & PROFESSIONS CODE

     SECTIONS 17200 ET SEQ. ("UCL")…………………………………..…26

     COUNT VI: UNJUST ENRICHMENT……………………………………30

     COUNT VII: VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW –

     DECEPTIVE PRACTICES………………………………………..………31

PRAYER FOR RELIEF……………………………………………...…………32

JURY TRIAL DEMAND…………………………………………………...……33

*PLAINTIFFS' COMPLAINT*
*[CLASS-ACTION]*

EX. A - 6

COME NOW Plaintiffs STACIA CULLORS, an individual; ERIC EBERLE, an individual; MAGGIE HARRISON, an individual; NICOLE SCURLOCK DEWEY, an individual; MERCEDES SCHROEDER, an individual; PATRICIA ANNE CRAWFORD, an individual, and all others similarly situated (collectively "Plaintiffs"), and through their counsel of record, Beverly Hills Trial Attorneys, P.C., file this class action complaint against CEREBRAL, INC. ("Cerebral"), and DOES 1 through 20, inclusive (collectively "Defendants"), seeking damages and relief on behalf of themselves and for all others similarly situated for: breach of contract, breach of implied covenant of good faith and fair dealing, professional negligence, fraudulent concealment and misrepresentation, violation of California's Unfair Competition Law - *Business & Professions Code* sections 17200, *et seq.* ("UCL"), unjust enrichment, and violation of California false advertising law, and related claims as stated herein as below. Unless explicitly stated to the contrary, all allegations are based upon information and belief.

## **INTRODUCTION**

1.      Cerebral, Inc. ("Cerebral") is a mental health telemedicine company that is subscription-based and provides its customers with access to therapy, counseling, and medication for ADHD, anxiety, depression, and other mental health conditions.

2.      Cerebral is a privately held for-profit company founded in January 2020 that surged in popularity during the pandemic as demand for services, especially remote services, grew.

3.      On its website, Cerebral describes its services to include "regular assessments, video/phone appointments with your prescriber, medication management, and medication delivery. . . ."[1] Cerebral offers clients both psychiatric and therapeutic services depending on the needs of each individual, which is determined through a single assessment done at the start of an individual's membership.

4.      Cerebral's subscription options include medication, therapy, coaching, counseling, or a combination of these treatments, all of which are available "in every U.S. state and Washington D.C."[2]

---

[1] *See* https://cerebral.com (last visited October 28, 2022).

[2] *See* https://cerebral.com/faqs#General_questionsIn_which_states_is_Cerebral_available_(last visited October 28, 2022).

5.      Furthermore, Cerebral's website indicates that consumers can "cancel [their] subscription at any time" if they no longer want their subscription and states that its subscribers can reach out to it by e-mail, text or call and that a representative is available from 6am-6pm Pacific Time Monday through Friday and from 7am-4pm Pacific Time Saturdays and Sundays. Moreover, it promises that all of its customers will "receive a response within one business day."

6.      Cerebral also promises its customers that it is a "physician-led company [that has] selected the most capable board-certified psychiatrists, physicians, physician assistants, and nurse practitioners to join [its] team" and that "[t]herapy sessions are scheduled week-to-week."[3]

7.      Moreover, until recently, Cerebral was among a handful of virtual care startups that prescribed controlled substances without patients seeing a doctor in person. However, Cerebral has now come under scrutiny for its prescribing practices, including but not limited to: (1) failing to provide access to adequate prescribers and counselors who have the knowledge and experience needed to treat patients with mental health conditions; (2) failing to provide therapy appointments for weeks on end and in a timely manner, sometimes providing its vulnerable customers who need consistent therapy, dates that are months out; (3) overprescribing medication, including controlled substances; (4) failing to timely provide access to medication, resulting in its customers suffering physical and mental health consequences, including but not limited to withdrawal from lack of timely prescription refills; (5) failing to provide Care Counselors who are available to help navigate scheduling or respond to inquiries about various issues in a timely manner; and (6) making it virtually impossible to cancel a membership.

**PARTIES**

**PLAINTIFFS**

8.      Plaintiff Stacia Cullors is, and at all times relevant here, has been a citizen of the state of California.

9.      Plaintiff Eric Eberle is, and at all times relevant here, has been a citizen of the state of Washington.

10.      Plaintiff Maggie Harrison is, and at all times relevant here, has been a citizen of the state of Florida.

---

[3] *See* https://cerebral.com/faqs#Our_care_team (last visited October 28, 2022).

EX. A - 8

11.     Plaintiff Nicole Scurlock Dewey is, and at all times relevant here, has been a citizen of the state of Michigan.

12.     Plaintiff Mercedes Schroeder is, and at all times relevant here, has been a citizen of the state of Florida.

13.     Plaintiff Patricia Anne Crawford is, and at all times relevant here, has been a citizen of the state of Maryland.

**DEFENDANTS**

14.     Defendant Cerebral, Inc is a mental health telemedicine company that provides its patients/customers with access to therapy, counseling, and medication for ADHD, anxiety, depression, and other mental health related conditions. It is a privately held for-profit company founded in January of 2020 and headquartered in San Francisco, California.

15.     At all relevant times, Defendants and each of them, inclusive, expected or should have expected that their acts would have consequences within the United States of America including the State of California and including Los Angeles County, as said Defendants derived and derive substantial revenue therefrom.

**JURISDICTION AND VENUE**

16.     This Court has jurisdiction over this action pursuant to the California Constitution.

17.     The Court has personal jurisdiction over Defendant Cerebral because this Defendant is a citizen of the State of California. Additionally, the Court has personal jurisdiction over Defendant Cerebral because it maintains and carries on systematic and continuous contacts in the State of California, and conducts business within the State of California, and/or otherwise intentionally avails itself of the California market through its promotion, sales, distribution and marketing within the State to render the exercise of jurisdiction by this Court permissible.

18.     Venue is proper in this Court because Defendant does business in Los Angeles County, and substantial parts of the events giving rise to at least one Plaintiff's claims occurred in this judicial district.

**GENERAL ALLEGATIONS**

19.     The Wall Street Journal reported in March 2022 that some health care workers working at startups such as Cerebral felt pressured to prescribe stimulants like Adderall to patients even though,

in their view, the company's 30-minute patient evaluations weren't long enough to properly diagnose ADHD.[4]

20.      A month later, in April 2022, Cerebral's former Vice President of Product & Engineering, Matthew Truebe filed a lawsuit in California State Court alleging that he was fired from his role after voicing concerns about unethical prescribing practices and patient safety issues. Mr. Truebe alleged that Cerebral's CEO directed him to devote "zero percent" of his Technology resources to compliance so they could be used for "activation and [patient] retention." In his suit, Mr. Truebe also alleged that Cerebral began tracking the retention rate of ADHD patients who were being prescribed stimulants against those who were not, and when it was determined that those who were prescribed the drugs were more likely to remain users, the company's chief medical officer told employees at a meeting that "the CMO's goal was to prescribe stimulants to 100% of Cerebral's ADHD patients." *See* a copy of this Complaint attached hereto as Exhibit "A."

21.      Shortly thereafter, it was announced that Cerebral was being investigated by the Department of Justice for its prescribing practices as "possible violations" of the Controlled Substances Act. In fact, Cerebral Medical Group received a grand jury subpoena from the U.S. Attorney's Office for the Eastern District of New York in May 2022.[5]

22.      After facing increased scrutiny from the media and former employees about its prescribing practices, including multiple complaint that it has been too quick prescribe powerful stimulant drugs, Cerebral announced in May 2022 that it would stop prescribing controlled substances.

23.      That same month, multiple pharmacies including Walmart, Inc. and CVS Health Corp. announced that they would stop filling prescriptions for controlled substances issued by telehealth startup Cerebral as a result of independent reviews they had conducted.[6]

---

[4] *See* https://www.wsj.com/articles/startups-make-it-easier-to-get-adhd-drugs-that-made-some-workers-anxious-11648267205?mod=article_inline (Published March 26, 2022).

[5] Heather Landi, *Cerebral under federal investigation for possible violations of controlled substances law*, Health Tech (May 7, 2022), available: https://www.fiercehealthcare.com/health-tech/cerebral-under-federal-investigation-possible-violation-controlled-substances-law (last visited October 28, 2022).

[6] Reuters, *Walmart, CVS to halt filling prescriptions for controlled substances by Cerebral, Done* (May 26, 2022), available: https://www.reuters.com/business/healthcare-pharmaceuticals/walmart-cvs-halt-filling-prescriptions-controlled-substances-by-cerebral-done-2022-05-26/ (last visited October 28, 2022).

24.     Multiple news reports have been released since which have reported on the various problems consumers have had with Cerebral's quality of care, including but not limited to the way Cerebral's health care providers diagnose and prescribe medications. Some of these reports have also been regarding Cerebral's practice of prescribing medication to patients, some of whom are extremely vulnerable, after a single brief virtual assessment. Moreover, CBS News's investigation revealed that of Cerebral's more than 1,500 prescribers listed on its website, only five are board-certified physicians, and that the majority are nurse practitioners from specialties outside of mental health.[7]

25.     In fact, it has now become clear that at all relevant times, Cerebral has  made a series of promises to its customers, which it did not intend to keep, in an attempt to get these individual, many of whom are amongst the most vulnerable in society, to sign up for its services and pay hefty amounts of money, only to trap them into an automatically renewing subscription service that (1) failing to provide access to adequate prescribers and counselors who have the knowledge and experience needed to treat patients with mental health conditions; (2) failing to provide therapy appointments for weeks on end and in a timely manner, sometimes providing its vulnerable customers who need consistent therapy, dates that are months out; (3) overprescribing medication, including controlled substances; (4) failing to timely provide access to medication, resulting in its customers suffering physical and mental health consequences, including but not limited to withdrawal from lack of timely prescription refills; (5) failing to provide Care Counselors who are available to help navigate scheduling or respond to inquiries about various issues in a timely manner; and (6) making it virtually difficult to cancel a membership and refusing to provide a refund despite not having services available to Plaintiffs in a timely manner.

26.     Cerebral, in exchange for a monthly customer subscription fee, promises access to prescriber visits, therapy, counseling and prescriptions to help with anxiety, depression, insomnia, ADHD and more mental health services, but fails to actually provide such services and access to its customers. By way of an example, Cerebral promotes access to a prescriber to ensure that customer's prescriptions and refills stay "on track," and in fact requires a monthly check in

---

[7] Anna Werner, *Expert alarmed by mental health app Cerebral's speedy sessions and prescriber qualifications*, CBS News (Sept. 7, 2022), available: https://www.cbsnews.com/news/cerebral-app-mental-health/ (last visited October 28, 2022).

with the prescriber in order for the patient to be able to get a re-fill of his/her medication. However, when many individuals including Plaintiffs have tried to schedule these appointments in order to receive a re-fill of their medication, which is at times highly necessary and imperative to their mental and physical well-being, they have been unable to schedule said appointments in a manner which ensures a timely re-fill of their medication. This has caused many of these individuals to experience withdrawal symptoms, including but not limited to nausea, headaches, dizziness, anxiety, confusion, irritability and sleep disturbance.

27.     Moreover, the abrupt discontinuation of their medication, has also worsened many of Plaintiffs and the class members' original mental health problems which were the reason why they signed up for Cerebral's services in the first place.

28.     The abovementioned unfair and improper practices have resulted in customers having to pay for an automatically renewing subscription service that does not provide the benefits they were promised, and which is in fact causing their mental health issues to worsen.

29.     Moreover, *Forbes* has recently published a report which indicates, based on leaked internal documents, Cerebral's "strict protocol for refunds" and reveals that Cerebral has certain internal protocols in place as to when a representative can and cannot issue a refund to its customers when a customer wishes to cancel his/her subscription.[8] Not surprisingly, amongst one of those scenarios where Cerebral's representatives will issue a refund is when legal action is threatened by a customer. *Id*.

30.     Customers, including Plaintiffs, have been charged when the only available therapy/counseling appointments are weeks away, and thereby not only are they unable to receive therapy but also are unable to receive prescriptions for medication they have previously been prescribed and are taking, causing gaps in their use of previously prescribed medication, which is a dangerous practice and could be life-threatening, especially in the case of those individuals struggling with serious mental health problems such as depression and anxiety.

---

[8] Katie Jennings, *Getting a Refund From Mental Health Startup Cerebral Can Take Its Own Toll on Customers*, FORBES (Feb. 18, 2022), available: https://www.forbes.com/sites/katiejennings/2022/02/18/getting-a-refund-from-mental-health-startup-cerebral-can-take-its-own-toll-on-customers/?sh=26abcd7a1cc6 (last visited October 28, 2022).

31.     Nonetheless, Cerebral does not advise its customers of these practices up front. In fact, when customers sign up, their credit/debit card is billed before they can see the schedule showing provider availability, and they are not clearly advised about Cerebral's internal refund and cancellation policies which make obtaining a refund nearly impossible for many people. In fact, customers do not have a clear understanding of the "material terms" of the transaction before their credit/debit card is charged.

32.     Cerebral's business model is targeted to appeal to individuals suffering from a wide variety of mental health conditions, some of which are very serious and could be life-threatening, who need consistent and reliable treatment and medication. Yet Cerebral exploits those vulnerabilities by luring its customers, such as Plaintiffs, in with promises for regular and consistent prescription medication and treatment plans. But not only does Cerebral fail to deliver on those promises, but it also endangers its customers' lives through its improper business practices.

33.     Cerebral's practices are unfair, deceptive, fraudulent and downright dangerous. Cerebral has benefited and continues to benefit from its improper practices at its customers' expense. Despite receiving hundreds of complaints with regards to its deceptive practices, Cerebral continues to engage in these unlawful and unfair practices.

**Plaintiff Stacia Cullors ("Culors")**

34.     Plaintiff Cullors signed-up for a Cerebral membership in April 2022. On May 2, 2022, after only one zoom meeting with a prescriber/counselor, she was prescribed Wellbutrin, an anti-depressant medication despite not having any symptoms for depression.

35.     Upon signing up for Cerebral, and at the single assessment, Plaintiff Cullors was asked why she was seeking help. She explained that she has spent many years trying to lose weight and that she has always struggled with losing weight as she never feels full and is always hungry. She further stated that despite putting in a lot of work over the years to try to stay healthy, she has been unable to do so fully given that her body does not seem to receive "the signal" that she is in fact full. Plaintiff Cullors also told the prescriber/counselor that because she had tried everything else, other than surgery, she believed that perhaps speaking to a therapist would help with her inability to lose weight and keep the weight off.

36.     Immediately, the health care provider reassured her that she could prescribe Plaintiff Cullors something to help her lose weight and help with her appetite. She told Plaintiff about Wellbutrin, to which Plaintiff Cullors responded that she was skeptical about taking this

medication as she knew it was an anti-depressant. Plaintiff Cullors indicated that she felt uncomfortable taking an anti-depressant for weight loss if it meant that she would be dependent on the medication after taking it for a while.

37.     Cerebral's counselor/prescriber told Plaintiff Cullors not to worry as she was prescribing a small dose but indicated to her not to abruptly discontinue the medication as it could be unsafe.

38.     Approximately a month and half after starting the medication, Plaintiff Cullors found out that she is pregnant. As there were mixed reviews online about the safety of Wellbutrin during pregnancy, Plaintiff Cullors attempted to schedule a meeting with the counselor/prescriber but was unable to get an immediate appointment.

39.     Some weeks later, after finally being able to meet with the counselor/prescriber, she was advised to discontinue the medication.

40.     Since taking Wellbutrin, Plaintiff Cullors has become progressively less motivated, less energetic, and has noticed that she is not interested in her usual hobbies that she partakes in on her days off from work as a nurse. Her motivation has worsened since ending Wellbutrin, to the point where she cannot engage in the things she enjoyed doing or loved before being prescribed and taking Wellbutrin. In fact, on most days she states that she feels nothing at all.

41.     Plaintiff Cullors does not have a history of depression, and has never had any issues related to depression during any of her prior pregnancies. In fact, she had never taken any psychiatric medications in her life prior to being prescribed Wellbutrin through Cerebral. However, given her current state, Plaintiff Cullors has been advised by her Obstetrics and Gynecology doctor that if she continues to get worse, she will have to take an anti-depressant. Plaintiff is faced with the guilt and possible risks of exposing her unborn child to medications that have not been proven to be safe.

42.     Plaintiff Cullors relied on the representations from Cerebral about its services and quality of care, including but not limited to the way Cerebral's health care providers diagnose and prescribe medications. Plaintiff was not aware of Cerebral's practice of overprescribing medication to patients, some of whom are extremely vulnerable, and was not aware that the majority of Cerebral's prescribers are nurse practitioners from specialties outside of mental health. Had Plaintiff Cullors been aware of Cerebral's improper practices, which clearly do not

meet the required standard of care, she would not have signed up or paid for a Cerebral subscription, and most certainly would not have taken the medication prescribed to her.

**Plaintiff Eric Eberle ("Eberle")**

43.    Plaintiff Eric Eberle signed-up for a Cerebral membership in March 2022 as he had insomnia on and off for many years. Following his one zoom meeting with a prescriber/counselor, he was prescribed medication to help with his insomnia.

44.    The next month, in April 2022, after he had already been charged $85.00 for the second month, he had his second video meeting with his prescriber at which point he was advised that Cerebral would not be able to prescribe him the medication he had been prescribed the month before and which he had been taking.  He was offered alternative medication which had not worked for him in the past.

45.    Given this new information and the fact that Cerebral would not prescribe him the medication he took the first month which was helping his symptoms, he tried to cancel his membership and requested a refund of the $85.00 he had already been charged.

46.    Plaintiff Eberle was frustrated and wasted a lot of time attempting to cancel his subscription and receive a refund. However, he was told that a refund was "not an option as [Cerebral] was like Netflix," meaning that you pay regardless of whether or not you watch anything.

47.    Plaintiff Eberle relied on the representations from Cerebral about the services it promised and the ease of cancelling the subscription based on the representations Plaintiff Eberle was presented at sign-up. Had Plaintiff Eberle been aware of Cerebral deceptive billing and cancellation practices, including the fact that he would be charged regardless of whether or not he received the services he needed, he would not have signed up or paid for a Cerebral subscription.

**Plaintiff Maggie Harrison ("Harrison")**

48.    Plaintiff Harrison signed-up for a Cerebral membership in April 2022 and was receiving both counseling and prescription medication through Cerebral for Borderline Personality Disorder (BPD), a mental health disorder that impacts a person's ability to regulate his/her emotions.

49.    She initially had no issues and was receiving monthly prescriptions and counseling service. However, when she attempted to sign-in for her August appointment, she noticed that unbeknownst to her and without her knowledge, her appointment had been canceled. Plaintiff was

surprised to find out about this but attempted to re-schedule her appointment as she thought it was an inadvertent mistake, but realized she is unable to schedule any appointments.

50.     Upon contacting Cerebral's customer service, Plaintiff was advised that her subscription has been canceled because "they" felt that it was in the best interest of both Plaintiff and Cerebral if Plaintiff Harrison received in-person help.

51.     When Plaintiff complained that she had received zero notice of cancellation, she was advised that multiple voicemails had been left for her. However, Plaintiff's phone was out of service during that same period of time and she had not received any calls or voicemails form Cerebral. Moreover, no e-mail correspondence was ever sent to her nor had either of her emergency contacts been contacted about this sudden cancelation. Additionally, she had not received any messages through the Cerebral Application indicating that her subscription had been canceled or that she should obtain help elsewhere.

52.     Plaintiff is a high-risk individual who has been diagnosed with a serious mental health disorder that need to be monitored and controlled at all times.

53.     As a result of Defendant Cerebral's sudden cancelation of her services, she was unable to get a re-fill of her prescription medication and was forced to suddenly stop the use of her medication. This caused Plaintiff to experience withdrawal symptoms, including but not limited to nausea, headaches, dizziness, anxiety, confusion, irritability and sleep disturbance.

54.     Moreover, the abrupt discontinuation of her medication, which is unsafe, has also worsened Plaintiff Harrison's original mental health problem which is no longer being controlled by medication and therapy and was the reason why she signed up for Cerebral's services in the first place.

55.     Plaintiff Harrison relied on the representations from Cerebral about its services and quality of care, including but not limited to the way Cerebral's health care providers diagnose and prescribe medications. Plaintiff who is an extremely vulnerable individual was shocked to find out that her subscription and appointment with her health care provider have been canceled without her knowledge. Had Plaintiff Harrison been aware of Cerebral's improper practices, which clearly do not meet the required standard of care, she would not have signed up or paid for a Cerebral subscription and would have tried to get help from elsewhere.

**Plaintiff Nicole Scurlock Dewey ("Dewey")**

56.     Plaintiff Dewey signed-up for a Cerebral membership in March 2022 in order to obtain help for her mental health, specifically, her Attention-Deficit/Hyperactivity Disorder (ADHD) which she had been diagnosed with prior to joining Cerebral.

57.     Upon joining Cerebral and after only one brief zoom meeting with a health care provider and an online quiz, her medication was switched from ADHD medication she had been previously prescribed by her previous doctor to the strongest dose of Effexor (150 mg), an anti-depressant and anti-anxiety medicine. This is despite the fact that she had never been diagnosed with depression or anxiety prior to Cerebral's provider diagnosing her as such after one brief assessment session over video call and an online quiz.

58.     After the first month, Plaintiff Dewey attempted to get a re-fill of her medication but was told that she needed to have a follow-up appointment with the prescriber in order to get a re-fill. As there were no slots available, Plaintiff was unable to have her follow-up appointment prior to her medication running out and therefore was unable to take her medication for at least three days prior to getting it re-filled.

59.     In August 2022, Plaintiff Dewey reached out to Cerebral and advised that she only had three days remaining of her medication as her prescriber had left Cerebral, she indicated that her new prescribed assigned to her did not have availability for another week and requested that she be connected to another prescriber who can see her sooner in order for her not to be off her medication. She also stated that going off of the medication causes her massive mood swings and has other side-effects.

60.     After multiple back and forth communications with Cerebral staff over a span of several days during which time she begged for their help, and being forced to be off her medication again for at least seven days while she waited to be connected to another prescriber, she was connected to a new provider who was able to see her and give her a re-fill for her medication.

61.     The abrupt discontinuation of her medication, which was unsafe, worsened Plaintiff Dewey's mental health and during the approximately one-week period that she did not have her medication, she was crying all of the time, was extremely moody and angry, and was unable to take care of her two businesses which resulted in a loss of income.

62.     As a result of her experience with Cerebral, which included two periods of time which did not have access to her prescribed medication, Plaintiff canceled her subscription and is being seen

by a different provider who has advised her that not only was it dangerous that suddenly she stopped taking the prescribed Effexor on two occasions given her lack of access to it, but also she should have never been prescribed anti-depression/anti-anxiety medication as she was misdiagnosed. Plaintiff is now receiving treatment for her ADHD, which was the original reason she had signed up with Cerebral.

63.     Plaintiff Dewey relied on the representations from Cerebral about its services and quality of care, including but not limited to the way Cerebral's health care providers diagnose and prescribe medications. Plaintiff had never taken any depression/anxiety medications in her life prior to being prescribed such medication through Cerebral.

64.     Plaintiff was not aware of Cerebral's practice of overprescribing medication to patients, some of whom are extremely vulnerable, and was not aware that the majority of Cerebral's prescribers are nurse practitioners from specialties outside of mental health. Had Plaintiff Cullors been aware of Cerebral's improper practices, which clearly do not meet the required standard of care, she would not have signed up or paid for a Cerebral subscription, and most certainly would not have taken the medication prescribed to her.

**Plaintiff Mercedes Schroeder ("Schroeder")**

65.     Plaintiff Schroeder signed-up for a Cerebral membership in April 2022 after being diagnosed with anxiety and depression and being told by her general practitioner to seek mental health help.

66.     Approximately a month after signing up with Cerebral she was able to have her first appointment with a prescriber, and a month and half after first signing up, she was able to meet with her Care Counselor. Throughout her subscription, her appointments with her prescriber(s) were canceled on several occasions without any explanations and would be re-scheduled without prior communication with Plaintiff Schroeder as to whether she was in fact available on the new dates.

67.     Plaintiff Schroeder's met with her Prescriber over a period of several months and even though she was already taking anti-depression and mood stabilizer medication, she was also prescribed anxiety medication to take twice a day. Given that she was having significantly less anxiety as she was already taking other anti-depression and mood stabilizer medication, Plaintiff did not follow the Prescriber's orders of taking two doses of the anxiety medication daily, and instead only took it sporadically and during anxiety attacks, which were infrequent.

68.     After months of having the same Prescriber, to whom she had opened up with about her personal life, one day Plaintiff Schroeder logged into her Cerebral dashboard to make an appointment with her regular Prescriber as she was running low on her medication, only to find that she no longer had a Prescriber assigned to her. Cerebral had de-designated Plaintiff Schroeder's prescriber without ever communicating with her or assigning her another. This caused a great deal of stress to Plaintiff Schroeder as she was running low on her depression and mood stabilizing medication.

69.     Over the course of two weeks, Plaintiff Schroeder reached out to her Care Coordinator, her previous Prescriber and to Cerebral support on multiple occasions through both e-mail and the message board in order to find out why she was no longer assigned a Prescriber and to schedule an appointment with a Prescriber. She also tried to manually re-book an appointment with her Prescriber but was unable to do so.

70.     In her attempts to contact Cerebral for support, she noticed that the message board on Cerebral's application/website had completely changed and she was no longer able to compose her own messages to her Care Coordinator. Instead, she could only reach out through previously written prompts, which would typically redirect her to a FAQ page.

71.     Plaintiff Schroeder submitted a request for a re-fill on at least four occasions but did not receive a single response nor a re-fill for her medication.

72.     After two-weeks of trying to get an appointment with her Prescriber and as she had less than a few days' worth of medication left, putting her in a state of panic, Plaintiff was forced to book an appointment with a Prescriber she did not know nor had previously spoken to.

73.     As a result of her experience with Cerebral, Plaintiff Schroeder no longer feels that she can trust her mental health with Cerebral as they have been extremely inconsistent, and their inconsistencies have caused her more mental strain than she had prior to signing up with Cerebral. Furthermore, Cerebral's Care Team has not been helpful and Plaintiff feels as though she is having the same conversations over and over again each time she meets with a team member regarding her mental health.

74.     Plaintiff is a high-risk individual who has been diagnosed with a serious mental health disorder that need to be monitored and controlled at all times.

75.     Plaintiff Schroeder relied on the representations from Cerebral about its services and quality of care, including but not limited to the way Cerebral's health care providers diagnose

and prescribe medications, and offer mental health counseling. Plaintiff who is an extremely vulnerable individual was shocked to find out that her Prescriber who she was vulnerable with and shared personal matters with, was de-designated from her care without her knowledge. Had Plaintiff Schroeder been aware of Cerebral's improper practices, which clearly do not meet the required standard of care, she would not have signed up or paid for a Cerebral subscription and would have tried to get help from elsewhere.

**Plaintiff Patricia Anne Crawford ("Crawford")**

76.     Plaintiff Crawford signed-up for a Cerebral membership in August 2022 in order to seek help with what she believed was anxiety and potentially Obsessive Compulsive Disorder ("OCD").

77.     After a single session with her Prescriber, on August 24, 2022, she was given her first prescription of Wellbutrin 150 mg. Plaintiff felt that this medication was helping her, though she suffered from some side-effects.

78.     A month later, Plaintiff had another appointment with her Prescriber. Plaintiff Crawford was asked a series of questions and was only allowed to respond with a yes or a no. She felt bullied as she was not allowed to speak other than staying yes or no. Her Prescriber decided to increase her dosage of Wellbutrin to 300 mg, which Plaintiff assumed was okay given that she is not a medical professional. Plaintiff is a petite woman who is only 4 ft. 11 in. and weighs about 100 pounds.

79.     As soon as the first day on which Plaintiff Crawford began taking her newly prescribed higher dose of Wellbutrin, she felt a heavy feeling on the left side of her chest and felt very tired but was unable to sleep. She also had feelings of fluttering her chest and tingling in her arms, and felt like she was going to faint, however, she was not sure why she was feeling this way.

80.     On the sixth day after starting the new dosage, Plaintiff called 911 as she felt extremely unwell, was unable to work, her heart was racing and her blood pressure was up. In fact, Plaintiff felt like she was going to pass out/faint. She was taken to the emergency room at her local hospital where she was kept overnight due to the possibility of seizures. She was told, while at the hospital, to immediately discontinue taking the Wellbutrin. Furthermore, the hospital called Poison control regarding the dosage of her medication.

81.     Plaintiff Crawford contacted Defendant Cerebral prior to her hospital stay, while at the hospital and even after she was released. However, she did not receive a single response from Cerebral despite the fact that Cerebral and its staff had put her health and wellbeing at risk. As a result of the events abovementioned, Plaintiff also missed multiple days of work.

82.     Plaintiff Crawford relied on the representations from Cerebral about its services and quality of care, including but not limited to the way Cerebral's health care providers diagnose and prescribe medications. Plaintiff was not aware of Cerebral's practice of overprescribing medication to patients, some of whom are extremely vulnerable, and was not aware that the majority of Cerebral's prescribers are nurse practitioners from specialties outside of mental health. Had Plaintiff Crawford been aware of Cerebral's improper practices, which clearly do not meet the required standard of care, she would not have signed up or paid for a Cerebral subscription, and most certainly would not have taken the medication prescribed to her, which put her life in danger.

## CLASS ACTION ALLEGATIONS

83.     As further stated herein as to the following claims, Plaintiffs bring their causes of action on behalf of themselves and all others similarly situated, and certification of this class action is appropriate under California *Code of Civil Procedure* section 382 and California *Civil Code* section 1781, because the questions of law or fact common to the respective Class members predominate over questions of law or fact affecting only individual members.

84.     Plaintiffs seek certification of the following **Nationwide Class**: All persons in the United States who purchased a Cerebral subscription from Cerebral's website or mobile app and who i) did not receive diligent mental-health care including regular assessments, regular appointments with prescribers and counselors, and competent medication management and/or ii) were charged for subscription services without receiving the promised mental health services.

85.     In addition and/or in the alternative, Plaintiffs seek certification of the following State class:

**California Class**: All persons in California who purchased a Cerebral subscription from Cerebral's website or mobile app and who i) did not receive diligent mental-health care including regular assessments, regular appointments with prescribers and counselors, and competent medication management and/or ii) were charged for subscription services without receiving the promised mental health services.

**Washington Class**: All persons in Washington who purchased a Cerebral subscription from Cerebral's website or mobile app and who i) did not receive diligent mental-health care including regular assessments, regular appointments with prescribers and counselors, and competent medication management and/or ii) were charged for subscription services without receiving the promised mental health services.

**Florida Class**: All persons in Florida who purchased a Cerebral subscription from Cerebral's website or mobile app and who i) did not receive diligent mental-health care including regular assessments, regular appointments with prescribers and counselors, and competent medication management and/or ii) were charged for subscription services without receiving the promised mental health services.

**Michigan Class**: All persons in Michigan who purchased a Cerebral subscription from Cerebral's website or mobile app and who i) did not receive diligent mental-health care including regular assessments, regular appointments with prescribers and counselors, and competent medication management and/or ii) were charged for subscription services without receiving the promised mental health services.

**Maryland Class**: All persons in Maryland who purchased a Cerebral subscription from Cerebral's website or mobile app and who i) did not receive diligent mental-health care including regular assessments, regular appointments with prescribers and counselors, and competent medication management and/or ii) were charged for subscription services without receiving the promised mental health services.

86.     Excluded from the Class are Defendants' officers, employees, agents or affiliates, and any judge who presides over this action, as well as past and present employees, officers and directors of Defendants.  Plaintiffs reserve the right to expand, limit, modify, or amend this Class definition, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

**A.    Commonality**

87.     There are questions of law and fact that are common to the claims of Plaintiffs. Among these common questions are the following:

a.     Whether Defendants' representations and/or omissions regarding its services were fraudulent;

b.     Whether Defendants violated California's Unfair Competition Law by misrepresenting material information to consumers regarding its services;

c.      Whether Defendants violated California's Unfair Competition Law by concealing material information from consumers regarding their services;

d.      Whether Defendants violated California's Unfair Competition Law by using uniform, deceptive business practices;

e.     Whether Defendants' conduct violates any of the applicable state or territorial consumer protection statutes;

f.     Whether Defendants owed a duty of care to their customers to ensure that they provided an adequate service that did not endanger their mental and/or physical well-being;

g     Whether Defendant was unjustly enriched as a result of its conduct;

h.     Whether Class Members have been injured by Defendant's conduct;

i.     Whether, and to what extent, equitable relief and/or other relief should be imposed on Defendant, and, if so, the nature of such relief; and

j.     Whether Defendants' conduct as set forth above injured consumers, and if so, the extent of the injury and damages

**B.     Numerosity**

k.   The members of the Class are so numerous that separate joinder of each member is impracticable.  Plaintiffs are informed and believe that in the County of Los Angeles alone, the members of the Class would easily exceed the minimum numbers to satisfy this requirement.

**C.     Typicality**

l.      Plaintiffs' claims are typical of the claims of the Class since each of the Plaintiffs was subject to the same or similar practices by Defendant, as was each member of the Class. Plaintiffs and Class members were injured in the same manner by Cerebral's course of conduct alleged herein.  Plaintiffs and all Class members have the same claims against Cerebral relating to the conduct alleged herein, and the same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class Members. Plaintiffs and all Class members sustained monetary and economic injuries arising out of Defendant's conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

m.    The core issues which predominate over all the other issues in the litigation involve Defendants' unfair, unlawful, negligent and fraudulent practices discussed above.

n.    Upon information and belief, there has never been a prior lawsuit certified as a class on behalf of Plaintiffs based on the allegations in this Complaint.

**D.    Adequacy of Representation**

o.    Plaintiffs will fairly and adequately protect the interests of the Class and are committed to the vigorous prosecution of this action. They have retained competent counsel, experienced in litigation of this nature, to represent them and members of the Class.  There is no hostility between Plaintiffs and the unnamed Class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

p.    To prosecute this case, Plaintiffs have chosen the law firm of Beverly Hills Trial Attorneys, P.C., whose attorneys have represented plaintiffs in class actions and as private attorneys general in bringing public interest actions.

**E.    Superiority**

q.    The questions of law or fact common to the claims of Plaintiffs and of each Class member predominate over any questions of law or fact affecting only individual members of the Class.  All claims by named Plaintiffs and unnamed Class members are based on the same alleged "across the board" representations by Defendants and other acts constituting negligence, unfair competition under the UCL, and fraudulent misrepresentations.

r.    Common issues predominate when as here, liability can be determined on a class-wide basis, even when there are some individualized damages.

s.    As a result, when determining whether common questions predominate, courts focus on the liability issue and if the liability issue is common to the class as in the case at bar, common questions are held to predominate over individual questions.

t.    Since all claims by named Plaintiffs and unnamed Class members are based on the same alleged "across the board" failures by Defendants and other unfair competition laws under the UCL, the predominance requirement needed for class action treatment is satisfied.

u.    A class action is superior to thousands of individual actions in part because of the non-exhaustive factors listed below:

i.    Joinder of all class members would create extreme hardship and inconvenience for the affected consumers because of their immense geographical dispersion.

ii. It is highly unlikely that individual Plaintiffs would shoulder the burden of this vast and complex litigation as many are simply too poor or uneducated about Defendants' actions to bring separate actions;

iii. The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

iv. Individual suits would not be cost effective. The costs to individual Plaintiffs in a collective action are lowered through the pooling or resources and by limiting the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity; and

v. The action is manageable as a class action; individual lawsuits are not economically maintainable as individual actions.

Defendants have also acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

88.     Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

89.     Plaintiffs and Defendant entered into contracts for the purchase of mental health and counseling services through the Cerebral application/website.

90.     Plaintiffs have fully performed all material covenants, conditions and obligations that they were required to perform by reason of their contracts, except to the extent waived, excused, or made impossible by Defendant's breaches of the contract.

91.     However, Plaintiffs never agreed that Defendant could charge them and then not deliver the promised services, and then continue to charge them monthly. This term is not part of the parties' contracts with one another, and Defendant did not have the right to act as such under the terms of its agreements with Plaintiffs.

92.     Moreover, Plaintiffs never agreed that Defendant could charge them to overprescribe medication that they do not actually need or misdiagnose them and prescribe medication they did not need to Plaintiffs who put their trust into Defendant's services and believed that Cerebral is a "physician-led company [that has] selected the most capable board-

certified psychiatrists, physicians, physician assistants, and nurse practitioners to join [its] team," as it states on its Website.

93.      Defendant's conduct frustrated the entire purpose of the contract and the reasons for why Plaintiffs contracted with Defendant in the first place, and materially breached its contracts with Plaintiffs, which had the direct and proximate effect of causing damages and injuries to Plaintiffs in an amount to be proven at trial, plus interest allowable under applicable law.

94.      Plaintiffs demand an award of any consequential damages, reasonable attorneys' fees and costs, and any other relief afforded under California law.

## SECOND CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

95.      Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs as if fully stated herein.

96.      A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance of the contract. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance. The duty to act in good faith and deal fairly requires adherence to commercial norms and prevents a contracting party from acting in contravention of the counterparty's objectively reasonable expectations arising from the agreement.

97.      Cerebral breached the covenant of good faith and fair dealing when it induced Class members to subscribe, charged them, failed to provide the promised services, and continued to charge Class members.

98.      All conditions required for Plaintiffs' and the Class members' performance under the agreement occurred. Plaintiffs' and Class members' were uniformly and materially subject to Cerebral's conduct.

99.      As a direct and proximate result of Cerebral's breaches of the covenant of good faith and fair dealing, Plaintiffs and Class members have been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Professional Negligence)

100.      Plaintiffs reallege and incorporate here by reference each of the foregoing paragraphs, and further allege as follows.

101.   Defendant owed a duty to Plaintiffs to exercise due care in performing their functions, duties and responsibilities in connection with its psychiatric and therapeutic services.

102.   Defendant knew or should have known with reasonable certainty that Plaintiffs would suffer monetary loss and damage as well as emotional and physical injuries if it or its employees failed to perform their duties within the reasonable standard of care at or about the time they performed their functions, duties and responsibilities.

103.   specifically, Defendant negligently failed to: (1) provide access to adequate prescribers and counselors who have the knowledge and experience needed to treat patients with mental health conditions; (2) provide therapy appointments for weeks on end and in a timely manner, sometimes providing its vulnerable customers who need consistent therapy, dates that are months out; (3) prevent overprescribing of medication, including controlled substances; (4) timely provide access to medication, resulting in its customers suffering physical and mental health consequences, including but not limited to withdrawal from lack of timely prescription refills; (5) provide Care Counselors who are available to help navigate scheduling or respond to inquiries about various issues in a timely manner; and (6) failed to provide a refund to its customers despite not having services available to Plaintiffs in a timely manner.

104.   Defendant's negligence was a substantial factor in causing Plaintiffs' harm. As a direct and proximate result of the negligence of Defendant and its employees, Plaintiffs have suffered and continue to suffer physical and emotional injuries as well as damages, including incidental and consequential damages, in an amount to be established at trial, plus interest at the legal rate. As a further proximate result of such conduct, Plaintiff has incurred reasonable attorneys' fees. Plaintiff reserves the right to amend this Complaint to insert the amount of additional special, consequential and general damages he has suffered after that amount is ascertained.

### FOURTH CAUSE OF ACTION

### (Fraudulent Concealment and Misrepresentation)

105.   Plaintiffs reallege and incorporate here by reference each of the foregoing paragraphs, and further allege as follows.

106.   Defendant made false representations of fact to Plaintiffs and concealed material facts from Plaintiffs.

107.   Plaintiffs are informed and believe, and on that basis allege, that Defendant deliberately concealed the true facts regarding Defendant's products and services, as well as circumstances and facts connected to such products and services.

108.   Plaintiffs are informed and believe, that Defendant either deliberately concealed the true facts known to it or failed to make any reasonable investigation to determine the true facts from which representations were made as to its products and services to determine whether they are true or false, and without having any sufficient basis on which to make any representations, knowingly made false representations, and concealed the truth with regards to its products and services as set forth in the Complaint.

109.   Specifically, throughout Plaintiffs' subscription periods with Defendant, Defendant (1) failed to provide access to adequate prescribers and counselors who have the knowledge and experience needed to treat patients with mental health conditions, despite representing that it would do so; (2) failed to provide therapy appointments for weeks on end and in a timely manner, sometimes providing its vulnerable customers who need consistent therapy, dates that are months out, despite its representation when they signed up that they would have access to consistent therapy; (3) overprescribed medication, including controlled substances, to Plaintiffs despite its promise that it is a "physician-led company [that has] selected the most capable board-certified psychiatrists, physicians, physician assistants, and nurse practitioners to join [its] team"; (4) failed to timely provide access to medication, resulting in its customers suffering physical and mental health consequences, including but not limited to withdrawal from lack of timely prescription refills despite its representations that its services include "regular assessments, video/phone appointments with your prescriber, medication management, and medication delivery. . . ."; and (5) made false representations to customers concerning the availability of appointments they will receive as Cerebral customers, and led them to believe that they will be able to easily book appointments, and refused to refund them even thought they were unable to book appointments in a timely manner and were unable to receive help they needed.

110.   These representations and promises made to Plaintiffs and the class members were in fact false. If these misrepresentations had not been made to Plaintiffs and the class members to induce them to sign up for Defendant's service, Plaintiffs would not have signed up for Defendant's services.

111.     At the time that these misrepresentations were made to Plaintiffs as alleged in the Complaint, Plaintiffs were ignorant of the falsity of these representations and believed them to be true.

112.     Plaintiffs reasonably and justifiably relied upon the intentional misrepresentations referenced above. This reliance was reasonable and justifiable in that Plaintiffs had no access to the truth underling the misrepresentations, while Defendant had access to said information.

113.     In addition to the above false misrepresentations, Defendant also concealed material facts from Plaintiff including, without limitation, that there were not enough therapy appointments for weeks on end and in a timely manner for its customers despite urging them to sign up for its services, nor were there prescriber appointments availability to timely provide access to medication, resulting in its customers suffering physical and mental health consequences, including but not limited to withdrawal from lack of timely prescription refills. Defendant also concealed the fact that Plaintiffs cannot receive a refund despite Defendant not having services available to provide to Plaintiffs in a timely manner. Plaintiffs are informed and believe, and on that basis allege, that Defendant concealed the referenced facts when it knew the true and correct facts.

114.     Plaintiffs are informed and believe, and on that basis allege, that when Defendant caused the facts as alleged in this complaint, among others, to be concealed, it knew that the facts omitted were material to Plaintiffs. Plaintiffs are further informed and believe, and on that basis further allege, that Defendant concealed such material facts with the intent that Plaintiffs rely on said omissions of fact and with the intent to induce such reliance.

115.     If Plaintiffs had been aware of the existence of the facts which were misrepresented and concealed by Defendant, Plaintiffs would not have proceeded forward with signing up and paying for Defendant's subscription services.

116.     As a direct and proximate result of Defendant's misrepresentations and concealments, Plaintiffs have suffered and continues to suffer emotional and physical injuries as well as damages, including incidental and consequential damages, in an amount to be established at trial, plus interest at the legal rate. As a further proximate result of such conduct, Plaintiffs have incurred reasonable attorneys' fees.

117. Defendant engaged in the acts alleged above with a willful, conscious and/or reckless disregards of Plaintiffs' rights and with willful, conscious or reckless disregard for the consequences of such conduct to Plaintiffs. These acts were committed with the intent to vex,

injure or annoy Plaintiffs and as such constitute oppression, fraud and malice under California Civil Code §3294. Accordingly, Plaintiffs are entitled to and hereby requests punitive damages in a sum to be proven at trial to deter Defendant from so acting in the future.

## FIFTH CAUSE OF ACTION

### (Violation of *Business and Professions Code* sections 17200, *et seq.*)

118.   Plaintiffs reallege and incorporate here by reference each of the foregoing paragraphs, and further allege as follows.

119.   Plaintiffs, pursuant to *Business and Professions Code* section 17204, bring this cause of action on behalf of themselves and as a private attorneys general.

120.   *Business and Professions Code* section 17200, *et seq.*, also known as the Unfair Competition Law, defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. The Unfair Competition Law imposes strict liability.  Plaintiffs need not prove that Defendants intentionally or negligently engaged in unlawful, unfair or fraudulent business practices – but only that such practices occurred.

***"Unlawful" Prong***

121.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

122.   As detailed in Plaintiffs' Cause of Action below, the Consumer Legal Remedies Act, California *Civil Code* sections 1750 - 1784, prohibits a business from engaging in sales practices that are deceptive or misrepresentations when offering goods and services to the general public.

123.   Defendants' unlawful business practices are ongoing, and unless enjoined under *Business & Professions Code* section 17203, and/or under section 17535, are likely to continue to deceive other members of the general public at the expense of Defendants' competitors.

124.   Defendants violated Cal. Bus. & Prof. Code sections 17200, *et seq.* by engaging in unlawful, unfair, or fraudulent business acts or practices and unfair, deceptive, untrue, or misleading advertising, including:

- failing to provide access to adequate prescribers and counselors who have the knowledge and experience needed to treat patients with mental health conditions;

**EX. A - 30**

- failing to provide therapy appointments for weeks on end and in a timely manner, sometimes providing its vulnerable customers who need consistent therapy, dates that are months out;
- overprescribing medication, including controlled substances;
- failing to timely provide access to medication, resulting in its customers suffering physical and mental health consequences, including but not limited to withdrawal from lack of timely prescription refills;
- making it virtually difficult to cancel a membership and refusing to provide a refund despite not having services available to Plaintiffs in a timely manner;
- Engaging in a marketing and billing program that is likely to mislead a reasonable consumer acting reasonably under the circumstances;
- Making false promises to customers concerning the availability of appointments they will receive as Cerebral customers, and leading them to believe that they will be able to easily book appointments, and continuing to charge them and refusing to refund them even when they are unable to book the appointments Cerebral is charging them for and being unable to receive the help they need;
- Omitting material information from their customers in order to induce them to subscribe; and
- Making it difficult for customers to cancel their subscriptions, even though Cerebral fails to provide the bargained for services.

***"Unfair" Prong***

125. A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

126. Defendant's business practices are unfair under the UCL because Defendant has acted in a manner that is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiffs and the Class Members. These business practices include but are not limited to (1) failing to provide access to adequate prescribers and counselors who have the knowledge and experience needed to treat patients with mental health conditions; (2) failing to provide therapy

appointments for weeks on end and in a timely manner, sometimes providing its vulnerable customers who need consistent therapy, dates that are months out; (3) overprescribing medication, including controlled substances; (4) failing to timely provide access to medication, resulting in its customers suffering physical and mental health consequences, including but not limited to withdrawal from lack of timely prescription refills; (5) failing to provide Care Counselors who are available to help navigate scheduling or respond to inquiries about various issues in a timely manner; and (6) making it virtually difficult to cancel a membership and refusing to provide a refund despite not having services available to Plaintiffs in a timely manner.

127.    Further, the impact of the practice against Plaintiffs and the Class Members far outweighs any possible justification or motive on the part of Defendant. The impact on Plaintiffs and the Class Members has been described.  Defendant can have no possible justification for engaging in immoral, unethical and substantially injurious act of charging Plaintiffs and the Class Members through misleading and deceptive conduct. Furthermore, Plaintiffs and the Class Members could not have reasonably avoided this injury because they relied on Defendant's advertising as to the quality and characteristics of the services being sold, as all consumers who rely on the verity of product advertising must do. Defendant's false advertising is also violative of public policy.

128.    The harm to Plaintiffs and Class members outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendants' legitimate business interests other than the misleading and deceptive conduct described herein.

***"Fraudulent" Prong***

129.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

130.    Defendant's acts and practices alleged above constitute fraudulent business acts or practices as they have deceived Plaintiffs into purchasing services which fail to provide access to adequate prescribers and counselors who have the knowledge and experience needed to treat patients with mental health conditions, fail to provide therapy appointments for weeks on end and in a timely manner, sometimes providing its vulnerable customers who need consistent therapy, dates that are months out, overprescribe medication, including controlled substances, fail to timely provide access to medication, resulting in its customers suffering physical and mental health consequences, including but not limited to withdrawal from lack of timely prescription refills and

failing to provide Care Counselors who are available to help navigate scheduling or respond to inquiries about various issues in a timely manner, and services that make it virtually difficult to cancel a membership and then refuse to provide a refund despite not having services available to Plaintiffs in a timely manner. Defendant's acts and practices are highly likely to deceive and have deceived members of the consuming public.

131.   Defendant's business practices, as alleged herein, also constitute fraudulent conduct because Defendant did not deliver the services it advertised. Defendant's representations and omissions in California were material because they were likely to deceive reasonable consumers.

132.   Plaintiffs and Class Members did not know about Defendant's improper practices when they signed up for Defendant's service. Accordingly, Defendant should not have omitted and/or misrepresented the facts surrounding its service.

133.   Defendants omitted and misrepresented material information pertaining to its service and, among other things, convinced Plaintiffs and Class Members to purchase more of its services, and to otherwise ensure that Plaintiffs and Class Members would not discover Defendant's underlying fraud regarding its omissions and misrepresentations regarding its services. As a result, Defendant violated Cal. Penal Code § 502.

134.   Defendant's fraud led to consumers paying for services that they would not have paid for if they knew the truth about these services.

135.   As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiffs and Class Members were injured and lost money. They did not receive the benefit of the bargain in purchasing these services, and they spent their own time and money dealing with various situations that arose as a result of Defendant's practices. Additionally, Plaintiffs were harmed or placed at risk of imminent harm by not receiving the proper care for their various mental health conditions.

136.   Defendants acted intentionally, knowingly, and maliciously in violation of California's Unfair Competition Law.

137.   Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices, declaratory relief, reasonable attorneys' fees and costs under

EX. A - 33

California Code of Civil Procedure § 1021.5, injunctive relief, and other appropriate equitable relief.

138.    In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiffs also seek, in addition to damages, restitution and other equitable relief, to recover attorney fees under (i) section 1021.5 of the *Code of Civil Procedure*, and/or (ii) the "common fund" doctrine available to prevailing Plaintiffs who confer a benefit on the general public.

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment)

139.    Plaintiffs reallege and incorporate here by reference each of the foregoing paragraphs, and further allege as follows.

140.    Plaintiffs and Class Members were enticed to purchase Defendant's services, which were not as Defendant represented them to be.

141.    Had Plaintiffs and the Class known of the fact that Defendant's subscription service fails to provide access to adequate prescribers and counselors who have the knowledge and experience needed to treat patients with mental health conditions, failing to provide therapy appointments for weeks on end and in a timely manner, sometimes providing its vulnerable customers who need consistent therapy, dates that are months out, overprescribs medication, including controlled substances, fails to timely provide access to medication, resulting in its customers suffering physical and mental health consequences, including but not limited to withdrawal from lack of timely prescription refills, fails to provide Care Counselors who are available to help navigate scheduling or respond to inquiries about various issues in a timely manner, and makes it virtually difficult to cancel a membership and refuses to provide a refund despite not having services available to Plaintiffs in a timely manner, they would not have purchased Defendant's services.

142.    Accordingly, Plaintiffs and Class Members were damaged, and Defendant was unjustly enriched, given that it misrepresented its services to Plaintiffs and defrauded them into purchasing said services.

143.    Furthermore, Defendant's conduct was willful, intentionally deceptive, and intended to cause economic injury to Plaintiffs and the Class. Defendants are therefore liable to pay punitive damages.

144.   Plaintiffs and Class Members are entitled to damages in the amount Defendant was unjustly enriched, to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Violation of California False Advertising Law)

145.   Plaintiffs reallege and incorporate here by reference each of the foregoing paragraphs, and further allege as follows.

146.   California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

147.   Defendant's conduct as alleged herein violates Cal. Bus. & Prof. Code § 17500 by intentionally making and disseminating statements to consumers in California and the general public concerning Defendant's products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendant to be untrue or misleading. Defendant has also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers and to the public as part of a plan or scheme with intent not to sell those services as advertised.

148.   Defendants violated Cal. Bus. & Prof. Code § 17500 by, *inter alia*: (1) failing to provide access to adequate prescribers and counselors who have the knowledge and experience needed to treat patients with mental health conditions; (2) failing to provide therapy appointments for weeks on end and in a timely manner, sometimes providing its vulnerable customers who need consistent therapy, dates that are months out; (3) overprescribing medication, including controlled substances; (4) failing to timely provide access to medication, resulting in its customers suffering physical and mental health consequences, including but not limited to withdrawal from lack of timely prescription refills; (5) failing to provide Care Counselors who are available to help navigate scheduling or respond to inquiries about various issues in a timely manner; and (6)

making it virtually difficult to cancel a membership and refusing to provide a refund despite not having services available to Plaintiffs in a timely manner.

149.    As such, engaging in marketing and billing practices that are likely to mislead a reasonable consumer acting reasonably under the circumstances; Making false promises to customers concerning the availability of appointments and leading them to believe that they will be able to easily book appointments, and then continuing to charge customers and refusing to refund them even when they are unable to book the appointments Cerebral is charging them for, and omitting material information in order to induce customers to subscribe; and

150.    Defendant's actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived.

151.    Plaintiffs and the members of the Classes were deceived by and relied on Defendant's statements and omissions to their detriment when they subscribed to Cerebral and were charged even though Cerebral was unable to provide the promised appointments. Moreover, there is a strong probability that other consumers and members of the public were also or are likely to be deceived as well. Any reasonable consumer would be misled by Defendant's false and misleading statements and material omissions. Plaintiffs and other members of the Classes did not learn of all of the abovementioned issues until after they had already signed up and were forced into paying for Defendant's service.

152.    Plaintiff and the Class lost money or property as a result of Defendant's violations because they would not have subscribed to Cerebral if the true facts about Cerebral's services were known to them.

153.    As a result of Defendant's misconduct pursuant to Cal. Bus. & Prof. Code § 17500, Plaintiffs and the Class are entitled to individual, representative, and public injunctive relief and any other necessary orders or judgments that will prevent Defendant from continuing with their false and deceptive advertisements and omissions; restitution that will restore the full amount of their money or property; disgorgement of Defendant's relevant profits and proceeds; and an award of costs and reasonable attorneys' fees.

**PRAYER FOR RELIEF**

154.    Plaintiffs STACIA CULLORS, an individual, ERIC EBERLE, an individual, MAGGIE HARRISON, an individual, NICOLE SCURLOCK DEWEY, an individual, MERCEDES SCHROEDER, an individual, and PATRICIA ANNE CRAWFORD, an individual,

and on behalf of all others similarly situated pray for relief and judgment against Defendants as follows:

     (a)    An order certifying the Class and designating STACIA CULLORS, an individual, ERIC EBERLE, an individual, MAGGIE HARRISON, an individual, and NICOLE SCURLOCK DEWEY, an individual, MERCEDES SCHROEDER, an individual, and PATRICIA ANNE CRAWFORD, an individual, as Class Representatives and their counsel as Class Counsel;

     (b)    Awarding Plaintiffs and the proposed Class members actual or compensatory damages according to proof;

     (c)    Awarding restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class members as a result of their unlawful, unfair and fraudulent business practices described herein;

     (d)    Awarding declaratory and injunctive relief as permitting by law or equity to individual Plaintiffs, including enjoining Defendants from continuing the unlawful practices set forth herein, and directing Defendants to identify, with Court supervision, victims of their misconduct and pay them all money they are required to pay;

     (e)    Exemplary and punitive damages sufficient to punish and deter the Defendants and others from future wrongful practices;

     (f)    Pre-judgment and post-judgment interest;

     (g)    Awarding attorneys' fees and costs; and

     (h)    Providing such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury of all issues raised in this Complaint.

DATED: November 4, 2022         **BEVERLY HILLS TRIAL ATTORNEYS, P.C.**

                     */s/ Azar Mouzari*
                     Azar Mouzari, Esq.
                     Nilofar Nouri, Esq.

# EXHIBIT A

Aaron P. Minnis, Esq. (SBN202935)
Sonya L. Smallets, Esq. (SBN226190)
Evan R. Ettinghoff, Esq. (SBN298949)
MINNIS & SMALLETS LLP
57 Post Street, Suite 801
San Francisco, California 94104
T: (415) 551-0885
F: (415) 683-7157
E: aaron@minnisandsmallets.com

Attorneys for Plaintiff
MATTHEW TRUEBE

ELECTRONICALLY
**FILED**
*Superior Court of California,*
*County of San Francisco*
**04/27/2022**
**Clerk of the Court**
BY: LAURA SIMMONS
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO—UNLIMITED JURISDICTION

CGC-22-599376

| | |
|---|---|
| MATTHEW TRUEBE,<br><br>            Plaintiff,<br><br>    vs.<br><br>CEREBRAL, INC; & DOES 1 THROUGH 10, INCLUSIVE,<br><br>            Defendants. | **Case No.:**<br><br>**COMPLAINT FOR DAMAGES**<br><br>(1) Violation of Cal. Labor Code §1102.5<br>(2) Wrongful Discharge in Violation of Public Policy<br>(3) Violation of Business & Professions Code §§17200 *et seq.*<br>(4) Breach of Written Contract<br>(5) Breach of Implied Covenant of Good Faith and Fair Dealing-Written Contract<br>(6) Nonpayment of Wages in Violation of Cal. Labor Code §§ 200 *et seq.*<br>(7) Promissory Fraud<br><br><br>Jury Trial Demanded |

COMES NOW PLAINTIFF MATTHEW TRUEBE for causes of action, and alleges as follows:

-1-

1   Cerebral, Inc is a mental health telemedicine company that provides its
2   patients/customers with access to therapy, counseling, and medication for
3   ADHD, anxiety, depression, and other conditions. In February 2021, Cerebral
4   hired Matthew Truebe for the position of Vice President, Product and
5   Engineering. Mr. Truebe performed well in his position, earning a solid
6   performance rating and positive feedback from his co-workers.

7   During his employment, Mr. Truebe spoke out against Cerebral's
8   unlawful business practices that consistently and at times egregiously put
9   profits and growth before patient safety, including objecting when Cerebral
10  planned to increase customer retention by prescribing stimulants to 100% of
11  its ADHD patients. Mr. Truebe also objected to Cerebral's practice of cheating
12  its employees out of stock options that they had worked hard to earn after
13  Cerebral demanded that he sign an amendment to his employment
14  agreement that would have retroactively reduced his stock option
15  compensation, as well as prohibited him from disclosing information that he
16  reasonably believed to constitute unlawful and unethical business practices
17  by Cerebral.

18  After Mr. Truebe raised concerns about signing the agreement, Cerebral
19  gave Mr. Truebe a negative performance evaluation, placed him on
20  administrative leave, and then wrongfully fired him without notice or basis
21  one day before his options vested, depriving Mr. Truebe of substantial
22  compensation and leaving him unemployed.

23  ## I. ALLEGATIONS

24  1.    Cerebral is a subscription-based online mental health service that
25  arranges for patients/customers to meet with a telehealth clinician or
26  therapist who can diagnose and treat ADHD, anxiety, depression, and other
27  conditions. It is a privately held for-profit company founded in January of
28  ///

1  2020 and headquartered in San Francisco, California. Kyle Robertson is the
2  Chief Executive Officer.

3      2.     The true names and capacities, whether individual, corporate or
4  otherwise, of DOES 1 through 10 are at this time unknown to Mr. Truebe,
5  who therefore sues said defendants by such fictitious names. Mr. Truebe will
6  ask leave to amend this complaint to reflect their true names and capacities
7  when the same have been ascertained. Mr. Truebe is informed and believes,
8  and thereon alleges, that each of said defendants is responsible, jointly and
9  severally, for the events and injuries described herein and caused damages
10 thereby as alleged herein.

11     3.     Mr. Truebe is informed and believes, and thereon alleges, that at
12 all times mentioned herein each and every co-defendant was and is the
13 predecessor-in-interest, successor-in-interest, agent, counselor, employee,
14 servant, partner, franchisee and/or joint venturer of each of other co-
15 defendant, and in doing the actions hereinafter mentioned, was and/or is
16 acting within the scope of its authority within such agency, employment,
17 counseling, service, partnership, franchise and/or joint venture or single
18 enterprise, and with the permission and consent of each co-defendant.
19 Plaintiff alleges that each of said defendants is responsible, jointly and
20 severally, for the events and injuries described herein and caused damages
21 thereby to Mr. Truebe as alleged herein.

22     4.     Mr. Truebe resides in California and is a seasoned technology
23 leader with 17 years of experience, including 11 years in technology
24 management. He has prior experience working in highly regulated industries,
25 including finance and banking, consumer goods, and telecom in addition to
26 healthcare.

27     5.     In early February 2021, Cerebral offered Mr. Truebe the role of
28 Vice President, Product & Engineering. Cerebral provided Mr. Truebe with a

written offer letter. The offer letter promised that Mr. Truebe would earn the option to purchase 246,822 shares of Cerebral common stock. Pursuant to the terms set forth in the offer letter, the shares vested over four years, with 25% of the award vesting on the one-year anniversary of the commencement of Mr. Truebe's employment. (Exhibit 1)

6.    At the time he received this offer from Cerebral, Mr. Truebe was considering other job opportunities. However, Mr. Truebe agreed to work at Cerebral based on Cerebral's promise of stock options and the CEO's representation that Cerebral's options package made Cerebral's offer more valuable than the other job offers that Mr. Truebe was considering.

7.    Mr. Truebe's employment at Cerebral commenced on February 16, 2021.

8.    Mr. Truebe's start date for vesting purposes was February 17, 2021, according to his vesting schedule.

9.    As Vice President, Product & Engineering, Mr. Truebe's primary job responsibility at Cerebral was leading the technology department, including product management, application design, software engineering, IT security and systems, and data. The technology department built, maintained, and supported applications used by patients and clinicians, while also improving the security of new and adopted applications.

10.    Mr. Truebe successfully performed the responsibilities of his position. In 2021, Cerebral provided Mr. Truebe with a written performance evaluation in which it rated his overall performance as "above meets" expectations. Mr. Truebe also received positive performance feedback from his co-workers, including senior leaders and direct reports.

11.    During his employment, Mr. Truebe observed and increasingly spoke out against what he reasonably believed to be Cerebral's unlawful business practices.

-4-

12.     Within a few months after Mr. Truebe started working at Cerebral, Cerebral's CEO directed Mr. Truebe to devote zero percent (0%) of his technology resources to compliance so that all his technology resources could be devoted to "activation and [patient] retention." As this would have severely undermined Mr. Truebe's ability to ensure that Cerebral followed applicable state and federal health care rules and regulations, Mr. Truebe refused the CEO's directive and continued devoting resources to compliance to ensure that Cerebral remained in compliance with applicable laws.

13.     On August 5, 2021, Mr. Truebe conducted an analysis which uncovered approximately 2,000 duplicate shipping addresses in Cerebral's patient database. This suggested that customers were setting up duplicate accounts to obtain additional medication. Mr. Truebe and another employee conducted this analysis after it was discovered that a customer with duplicate accounts received duplicate prescriptions from multiple Cerebral licensed prescribers, which suggested prescription fraud. Mr. Truebe reported the findings of his analysis to Cerebral's CEO and to Cerebral's General Counsel and advised them that this issue needed to be addressed. However, to Mr. Truebe's knowledge, they failed to act, and when Mr. Truebe raised the issue at a larger meeting, Cerebral's CEO said that this issue was his "lowest priority."

14.     During Mr. Truebe's employment, the CEO asked Cerebral employees to track the rate of retention of Cerebral's ADHD patients/customers who were being prescribed stimulants by Cerebral prescribers, as compared to those who were not. When Cerebral determined that patients who were prescribed stimulants were more likely to remain Cerebral customers, the CEO directed Cerebral employees find ways to prescribe stimulants to more ADHD patients to increase retention. The CEO ///

-5-

suggested that Cerebral should require prescribers to prescribe stimulants to their patients.

15.     Thereafter, Cerebral continued to track the retention rate of its customers who were prescribed controlled substances as compared to those who were not. At a meeting which Mr. Truebe attended, the Chief Medical Officer (CMO) asked Cerebral employees to conduct an analysis of the retention rate for customers who wanted a controlled substance who were not matched to a Cerebral prescriber (i.e., someone who could prescribe the controlled substance). The analysis showed customer retention was low for this category of patients.

16.     During a subsequent meeting, the CMO told employees, including Mr. Truebe, that the CMO's goal was to prescribe stimulants to 100% of Cerebral's ADHD patients. Mr. Truebe told the CMO that this was not safe or legal, and that stimulants, which are addictive, should not be prescribed for purely business reasons, such as to increase Cerebral's customer retention.

17.     Mr. Truebe discovered that Cerebral employees and former employees could gain unauthorized access to confidential patient medical information. When Mr. Truebe's team investigated this issue, they determined that tens of thousands of confidential patient records had been compromised. Mr. Truebe reported the data breach to Cerebral leadership and told them that it had to be reported to regulators. However, to Mr. Truebe's knowledge, Cerebral failed to do so.

18.     Around the same time, Cerebral's Chief Information Security Officer ("CISO"), who reported to Mr. Truebe, raised concerns to Mr. Truebe about a separate data security issue that could have resulted in the further unauthorized disclosure of confidential medical information. The CISO told Mr. Truebe that she wanted to formally document her concerns in writing to the CEO and the General Counsel. When the CEO and General Counsel were

informed of the CISO's concerns, they pressured Mr. Truebe to instruct the CISO not to document the issue, which he refused to do.

19.     In early January of 2022, Mr. Truebe raised additional concerns to the CEO about Cerebral's failure to adequately address patient safety issues. When a patient safety issue, such as an overdose or suicidal ideation, is reported to Cerebral, the issue is supposed to be documented and Cerebral, through its health care professionals, is supposed to follow up, particularly if the issue is serious. However, Mr. Truebe learned that, on many occasions, Cerebral failed to address these incidents in a timely manner and sometimes failed to respond at all. Mr. Truebe brought this issue to the attention of the CEO and told the CEO that the CMO appeared more focused on business development than clinical safety, referencing the fact that the CMO did not attend compliance meetings. However, the CEO brushed aside Mr. Truebe's concerns.

20.     Around this time, Cerebral's General Counsel gave Mr. Truebe an amendment to his offer letter that Cerebral wanted him to sign. The amendment sought to replace language in his initial offer letter—which stated that the company would grant Mr. Truebe the option to purchase 246,822 shares—with new language reducing Mr. Truebe's grant by approximately half to just 125,000 shares. The amendment thus sought to reduce Mr. Truebe's compensation by a total of 121,822 options, both prospectively and retroactively.

21.     Mr. Truebe told the General Counsel that he was reluctant to renegotiate his compensation retroactively, and that he was concerned that he was being subjected to retaliation for having been vocal about various compliance issues. He asked the General Counsel to ensure that Cerebral investigated his concerns. However, as far as Mr. Truebe is aware, Cerebral made no such effort.

-7-

22.     On January 13, 2022, the General Counsel again contacted Mr. Truebe about the amendment. She said that the CEO believed that Mr. Truebe had been "talking to people" and warned Mr. Truebe that he previously had signed a nondisclosure agreement. She told Mr. Truebe that he "can't talk negatively about the company" and "can't say [the company] is out of compliance."

23.     On January 18, the General Counsel sent Mr. Truebe a revised amendment and said that he needed to let her know whether he would sign it by the following day. Unlike the prior version, the revised amendment included a non-disparagement clause that would have unlawfully prohibited Mr. Truebe from discussing or disclosing, internally or otherwise, Cerebral activities that he reasonably believed to be unlawful or unethical and further stated that doing so would be grounds to terminate Mr. Truebe for cause. Based on the General Counsel's comments, Mr. Truebe was concerned that Cerebral included the unlawful non-disparagement provision in the amendment to extinguish his right to blow the whistle regarding the company's unlawful and unethical activities. (Exhibit 2)

24.     On Friday, January 21, Cerebral's CEO demanded to speak with Mr. Truebe after working hours. During the phone call, the CEO threatened Mr. Truebe that, unless he signed the amendment, Cerebral would "go nuclear," give Mr. Truebe a negative performance evaluation, terminate Mr. Truebe's employment, and cause "meaningful harm to [his] professional reputation." At the same time, Cerebral curtailed Mr. Truebe's access to Cerebral's systems, preventing him from fully executing his security-related duties. Cerebral also revoked Mr. Truebe's access to information about his performance goals and progress.

25.     Mr. Truebe did not sign the amendment.

///

-8-

26. On January 30, 2022, Cerebral placed Mr. Truebe on administrative leave.

27. On February 14, 2022, weeks after other employees had already received their performance evaluations, Cerebral provided Mr. Truebe with a negative performance evaluation that unfairly characterized Mr. Truebe's performance.

28. On February 16, 2022, Cerebral terminated Mr. Truebe's employment, as the CEO had threatened, one day before Mr. Truebe vested in one quarter of the options awarded to him pursuant to the terms of his initial offer letter. In terminating Mr. Truebe's employment, Cerebral failed to comply with its own written standards for taking disciplinary action against its employees and its own written termination process.

29. Cerebral terminated Mr. Truebe to silence him, to deprive him from vesting in the options that it promised him at the beginning of his employment, and to retaliate against him for engaging in protected activities.

30. Mr. Truebe is informed and believes that Cerebral has engaged in similar unlawful, fraudulent, and unethical conduct toward other employees who, like Mr. Truebe, were initially promised stock options in exchange for their employment services and thereafter coerced into retroactively accepting substantially fewer options.

31. Defendant's actions were undertaken for improper purposes as alleged above and were willful, oppressive and in conscious disregard of plaintiff's rights, and were designed and intended to cause and did, in fact, cause and continue to cause plaintiff to suffer severe emotional distress, pain and suffering, and substantial economic damage and, therefore, justify the awarding of exemplary and punitive damages.

32. The above allegations are incorporated by reference in each cause of action stated below.

## II. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violation of California Labor Code §§ 1102.5, 1102.6)

33.    Defendant was Plaintiff's employer.

34.    Plaintiff disclosed to Defendant conduct that he reasonably believed was unlawful. This conduct includes, but is not limited to, Defendant allowing patients to create multiple accounts and thereby obtain duplicate prescriptions, maintaining a policy of prescribing stimulants to every ADHD patient, not reporting data breaches involving protected health information to regulatory agencies, failing to adequately respond to clinical safety issues such as suicidal ideation, requiring employees not to disclose information internally (or otherwise) that the employees reasonably believe to constitute unlawful conduct by Cerebral, and discharging or threating to discharge employees to avoid paying compensation that Cerebral promised employees in exchange for services rendered.

35.    Plaintiff had reasonable cause to believe that the information disclosed violations of state and federal laws and regulations pertaining to health care, prescription of controlled substances, payment of wages, whistleblowing, and non-disparagement or non-disclosure agreements required as a condition of employment.

36.    Defendant discharged Plaintiff.

37.    Plaintiff's disclosure of conduct that he reasonably believed was unlawful was a contributing factor in Defendant's decision to discharge plaintiff.

38.    Plaintiff was harmed.

39.    Defendant's conduct was a substantial factor in causing Plaintiff's harm.

///

**SECOND CAUSE OF ACTION**

**(Wrongful Discharge in Violation of Public Policy)**

40.    Plaintiff was employed by Defendant.

41.    Defendant discharged Plaintiff.

42.    Plaintiff's complaints about unlawful conduct were a substantial motivating reason for Plaintiff's discharge.

43.    The discharge caused Plaintiff harm.

**THIRD CAUSE OF ACTION**

**(Violation of Bus. & Prof. Code §§ 17200 *et seq*.)**

44.    The foregoing conduct, as alleged, violates the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*., which prohibits unfair competition by prohibiting, *inter alia*, any unlawful or unfair or fraudulent business acts or practices.

45.    During Plaintiff's employment, Defendant committed acts of unfair competition, as defined by the UCL, by among other things engaging in the acts and practices described herein, including seeking to compel employees under threat of termination to accept a retroactive reduction in compensation and by terminating Plaintiff and others to avoid paying earned or promised compensation.

46.    Defendant's conduct, as described herein, has damaged Plaintiff by unlawfully, fraudulently and/or unethically denying Plaintiff earned or promised wages and is therefore substantially injurious to Plaintiff.

47.    Defendant's course of conduct in violation of California laws, as described herein, is a separate violation of the UCL and violates the policy or spirit of such laws or otherwise significantly threatens or harms competition. Plaintiff seeks disgorgement in the amount of respective unpaid wages and such other legal and equitable relief from Defendant's unlawful and willful conduct as the Court deems proper.

## **FOURTH CAUSE OF ACTION**

### **(Breach of Written Contract)**

48.     Plaintiff and Defendant entered into a written employment agreement.

49.     Plaintiff did all or substantially all the significant things that the contract required him to do.

50.     Defendant sought to deprive and in fact did deprive Plaintiff of the benefits according to the terms of the contract after Plaintiff substantially performed under the contract.

51.     As a result, Plaintiff was harmed.

## **FIFTH CAUSE OF ACTION**

### **(Breach of Implied Covenant of Good Faith and Fair Dealing)**

52.     Plaintiff and Defendant entered into a written employment agreement.

53.     Plaintiff did all, or substantially all, of the things that that contract required him to do.

54.     Defendant interfered with Plaintiff's right to receive the benefits of the contract, including without limitation the compensation contemplated under the parties' agreement. Defendant also sought to impose unlawful non-disparagement and non-disclosure terms as a condition of Plaintiff's employment.

55.     As a result, plaintiff was harmed.

///
///
///
///
///
///

-12-

1

## SIXTH CAUSE OF ACTION

### (Nonpayment of Wages in Violation of

### Cal. Labor Code §§ 200 *et seq.*)

56.     A strong public policy in California favors full and prompt payment of wages due an employee. An employee's wages are the amount the employer has offered or promised to pay as compensation for the employee's labor and includes all amounts for labor performed by an employee of every description. Wages includes not only the periodic monetary earning of the employee but also the other benefits to which the employee is entitled as part of his compensation.

57.     Plaintiff performed work for Defendant.

58.     Defendant owes Plaintiff wages in the form of stock options under the terms of their employment agreement.

59.     The amount of unpaid wages is calculable according to the value of Defendant's common shares.

### SEVENTH CAUSE OF ACTION

### (Promissory Fraud)

60.     Defendant promised Plaintiff that he would receive certain wages and benefits as alleged with specificity herein.

61.     These promises were important to the parties' relationship.

62.     Defendant did not intend to perform these promises when they were made, or Defendant made these promises recklessly.

63.     To his detriment, Plaintiff reasonably relied on Defendant's promises by rejecting other employment offers to accept employment with Defendant.

64.     Defendant did not perform the promised acts.

65.     Plaintiff was harmed.

///

-13-

66.   Plaintiff's reliance on Defendant's promises was a substantial factor in causing plaintiff's harm.

### III. PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks, to the extent allowed by law, economic damages, non-economic damages for pain, suffering and emotional distress, exemplary damages, reliance damages including lost wages, expert witness fees, equitable relief, injunctive relief, declaratory relief, disgorgement of defendant's unjust gains including stock options wrongfully withheld from Plaintiff, legal interest, statutory attorney's fees, and costs of suit.

Plaintiff further seeks such other relief as the court deems just.


DATED: April 27, 2022

MINNIS & SMALLETS LLP


by:   /s/ Aaron P. Minnis
AARON P. MINNIS, ESQ.
Attorneys for Plaintiff
MATTHEW TRUEBE

-14-

# Exhibit 1

February 19, 2021

Matthew Truebe

**Re: Employment Offer**

Dear Matthew,

Cerebral Inc., a Delaware corporation d/b/a Cerebral ("Cerebral") is pleased to offer you the position of Vice President of Product & Engineering on the following terms beginning February 16, 2021.

You will report directly to Chief Executive Officer, Kyle Robertson. Cerebral may change your position, duties, and work location as well as who you report to from time to time in its discretion.

Your salary will be $300,000 per year, less payroll deductions and withholdings, paid on Cerebral's normal payroll schedule, with potential for a bonus which shall be determined on the basis of the attainment of Company performance metrics and/or individual performance objectives. In addition, Cerebral will grant you an incentive stock option (the "Option") to purchase 246,822 shares of Cerebral's common stock. These shares shall vest over four (4) years beginning with twenty-five percent (25%) vested on the one (1) year anniversary of the commencement of your employment (i.e., 1-year cliff) and monthly thereafter. With respect to the foregoing stock option, and subject to approval by Cerebral's Board of Directors, Cerebral will recommend to the Board that the option include an accelerated vesting provision whereby 50% of the remaining unvested shares shall vest should you be terminated without cause within 12 months following a change of control.

During your employment, you will be eligible to participate in the standard benefits plans offered to similarly situated employees by Cerebral from time to time, subject to plan terms and generally applicable Cerebral policies. A full description of these benefits is available upon request. Exempt employees may take a reasonable amount of time off with pay, as permitted by their duties and responsibilities, and as approved in advance by their supervisor. Exempt employees do not accrue vacation, and there is no set guideline as to how much vacation each employee will be permitted to take. Supervisors will approve paid vacation requests based on the employee's progress on work goals or milestones, status of projects, fairness to the working team, and productivity and efficiency of the employee. Since vacation is not allotted or accrued, "unused" vacation time will not be carried over from one (1) year to the next nor paid out upon termination. Cerebral may change compensation and benefits from time to time in its discretion.

As a Cerebral employee, you will be expected to abide by all Cerebral rules and policies. As a condition of employment, you must sign and comply with the attached Employee Confidential Information and Inventions Assignment Agreement ("Exhibit A") that prohibits unauthorized use or disclosure of Cerebral's proprietary information, among other obligations and is incorporated herein.

In your work for Cerebral, you will be expected not to use or disclose any confidential information, including trade secrets, of any former employer or other person to whom you have an obligation of confidentiality. Rather, you will be expected to use only that information that is generally known and used by persons with training and experience comparable to your own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by Cerebral. You agree that you will not bring onto Cerebral premises any unpublished documents or property belonging to any former employer or other person to whom you have an obligation of confidentiality. You hereby represent that you have disclosed to Cerebral any contract you have signed that may restrict your activities on behalf of Cerebral.

Exhibit 1

DocuSign Envelope ID: 12A04F48-A9F4-463D-A95S-B73D3D4E8D59

Normal business hours are from 9:30 a.m. to 6:30 p.m. CST, Monday through Friday, excluding national holidays. As an exempt salaried employee, you will be expected to work additional hours as required by the nature of your work assignments.

You may terminate your employment with Cerebral at any time and for any reason whatsoever simply by notifying Cerebral in writing. Likewise, Cerebral may terminate your employment at any time, with or without cause or advance notice. Your employment at-will status can only be modified in a written agreement signed by you and by an officer of Cerebral.

This offer is contingent upon a reference check and satisfactory proof of your right to work in the United States. You agree to assist as needed and to complete any documentation at Cerebral's request to meet these conditions.

This letter, together with Exhibit A, forms the complete and exclusive statement of your employment agreement with Cerebral. It supersedes any other agreements or promises made to you by anyone, whether oral or written. Changes in your employment terms, other than those changes expressly reserved to Cerebral's discretion in this letter, require a written modification signed by an officer of Cerebral. If any provision of this offer letter agreement is determined to be invalid or unenforceable, in whole or in part, this determination shall not affect any other provision of this offer letter agreement and the provision in question shall be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible under applicable law.

Please sign and date this letter, and Exhibit A, and return them to me.

We look forward to your favorable reply and to a productive and enjoyable work relationship.

Sincerely,

_Kyle Robertson_

Kyle Robertson, CEO
**Cerebral, Inc.**

2/23/2021

Date

Understood and Accepted:

_Matthew Truebe_

Matthew Truebe

2/19/2021

Date

DocuSign Envelope ID: 12A04FA8-A9E4-463D-A95E-B73D3D4E8D59

# EXHIBIT A

## CEREBRAL, INC.'S
## CONFIDENTIAL INFORMATION AND
## INVENTION ASSIGNMENT AGREEMENT

Employee Name: Matthew Truebe
Effective Date: February 16, 2021

As a condition of my becoming employed (or my employment being continued) by Cerebral, Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, "Cerebral"), and in consideration of my employment with Cerebral and my receipt of the compensation now and hereafter paid to me by Cerebral, the receipt of Confidential Information (as defined below) while associated with Cerebral, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I agree to the following:

1.      **Relationship.**  This Confidential Information and Invention Assignment Agreement (this "Agreement") will apply to my employment relationship with Cerebral. If that relationship ends and Cerebral, within a year thereafter, either reemploys me or engages me as a consultant, I agree that this Agreement will also apply to such later employment or consulting relationship, unless Cerebral and I otherwise agree in writing. Any such employment or consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

2.      **Confidential Information.**

        (a)      **Protection of Information.**  I understand that during the Relationship, Cerebral intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to Cerebral. I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of Cerebral to the extent necessary to perform my obligations to Cerebral under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from Cerebral in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I further agree not to make copies of such Confidential Information except as authorized by Cerebral.

        (b)      **Confidential Information.**  I understand that "Confidential Information" means information and physical material not generally known or available outside Cerebral and information and physical material entrusted to Cerebral in confidence by third parties. Confidential Information includes, without limitation:  (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of Cerebral (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of Cerebral on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans,

- 3 -

financial forecasts, historical financial data, budgets or other business information disclosed to me by Cerebral either directly or indirectly, whether in writing, electronically, orally, or by observation.

(c)     **Third Party Information.** My agreements in this Section 2 are intended to be for the benefit of Cerebral and any third party that has entrusted information or physical material to Cerebral in confidence. I further agree that, during the term of the Relationship and thereafter, I will not improperly use or disclose to Cerebral any confidential, proprietary or secret information of my former employer(s) or any other person, and I agree not to bring any such information onto Cerebral's property or place of business.

(d)     **Other Rights.** This Agreement is intended to supplement, and not to supersede, any rights Cerebral may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

(e)     **U.S. Defend Trade Secrets Act.** Notwithstanding the foregoing, the U.S. Defend Trade Secrets Act of 2016 ("DTSA") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (iii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

(f)     **Employee Right to Privacy on Personal Devices.** Cerebral does not have the right to information that any employee houses on their personal device that they use for work, if it is not related to Cerebral work.

3.     **Ownership of Inventions.**

(a)     **Inventions Retained and Licensed.** I have attached hereto, as Exhibit 1, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date: (i) I made, and/or (ii) belong solely to me or belong to me jointly with others or in which I have an interest, and that relate in any way to any of Cerebral's actual or proposed businesses, products, services, or research and development, and which are not assigned to Cerebral hereunder; or, if no such list is attached, I represent that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on Exhibit 1, I hereby forever waive any and all rights or claims of ownership to such Inventions. I understand that my listing of any Inventions on Exhibit 1 does not constitute an acknowledgement by Cerebral of the existence or extent of such Inventions, nor of my ownership of such Inventions. I further understand that I must receive the formal approval of Cerebral before commencing my Relationship with Cerebral.

(b)     **Use or Incorporation of Inventions.** If in the course of the Relationship, I use or incorporate into a product, service, process or machine any Invention not covered by Section 3(d) of this Agreement in which I have an interest, I will promptly so inform Cerebral in writing. Whether or not I give such notice, I hereby irrevocably grant to Cerebral a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c)     **Inventions.**  I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable. I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon. I understand that "Company Inventions" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship, except as otherwise provided in Section 3(g) below.

(d)     **Assignment of Company Inventions.**  I hereby assign to Cerebral, or its designee, and I agree that I will promptly make full written disclosure to Cerebral of and to hold in trust for the sole right and benefit of Cerebral, all my right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein. I hereby waive and irrevocably quitclaim to Cerebral or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

(e)     **Maintenance of Records.**  I agree to keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Relationship. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of Cerebral at all times. I agree not to remove such records from Cerebral's place of business except as expressly permitted by Cerebral's policy which may, from time to time, be revised at the sole election of Cerebral for the purpose of furthering Cerebral's business. I agree to deliver all such records (including any copies thereof) to Cerebral at the time of termination of the Relationship as provided for in Section 4 and Section 5.

(f)     **Patent and Copyright Rights.**  I agree to assist Cerebral, or its designee, at its expense, in every proper way to secure Cerebral's, or its designee's, rights in Cerebral Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to Cerebral or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which Cerebral or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and agree never to assert such rights, and in order to assign and convey to Cerebral or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world. I hereby irrevocably designate and appoint Cerebral and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such instruments and papers and to do all other lawfully

permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

        (g)    **Exception to Assignments.**  Subject to the requirements of applicable state law, if any, I understand that Cerebral Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to Cerebral do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any, attached hereto as Exhibit 2. In order to assist in the determination of which inventions qualify for such exclusion, I will advise Cerebral promptly in writing, during and for a period of twelve (12) months immediately following the termination of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

        4.    **Cerebral Property; Returning Cerebral Documents.**  I acknowledge and agree that I have no expectation of privacy with respect to Cerebral's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice. I further agree that any property situated on Cerebral's premises and owned by Cerebral, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Cerebral personnel at any time with or without notice. I agree that, at the time of termination of the Relationship, I will deliver to Cerebral (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to Cerebral, its successors or assigns.

        5.    **Termination Certification.**  In the event of the termination of the Relationship, I agree to sign and deliver the "<u>Termination Certification</u>" attached hereto as Exhibit 3; however, my failure to sign and deliver the Termination Certification shall in no way diminish my continuing obligations under this Agreement.  In the event of a termination of the Relationship without cause, Cerebral and I agree to a mutually agreeable internal and external message regarding my departure from Cerebral.

        6.    **Notice to Third Parties.**  I agree that during the periods of time during which I am restricted in taking certain actions by the terms of Section 7 of this Agreement (the "<u>Restriction Period</u>"), I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of my contractual obligations under this Agreement. I also understand and agree that Cerebral may, with or without prior notice to me and during or after the term of the Relationship, notify third parties of my agreements and obligations under this Agreement. I further agree that, upon written request by Cerebral, I will respond to Cerebral in writing regarding the status of my employment or proposed employment with any party during the Restriction Period.

        7.    **Other Parties.**  As described above, I acknowledge and agree that Cerebral's Confidential Information includes information relating to Cerebral's employees, consultants, customers and others, and that I will not use or disclose such Confidential Information except as authorized by Cerebral. I further agree as follows:  I agree that during the term of the Relationship, I will not negatively influence any of Cerebral's clients, licensors, licensees or customers from purchasing Cerebral products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of Cerebral.

- 6 -

DocuSign Envelope ID: 12A04EA8-AD54-463D-A9E6-B73D3D4E8D59

8.    **At-Will Relationship.**  I understand and acknowledge that, except as may be otherwise explicitly provided in a separate written agreement between Cerebral and me, my Relationship with Cerebral is and shall continue to be at-will, as defined under applicable law, meaning that either I or Cerebral may terminate the Relationship at any time for any reason or no reason, without further obligation or liability, other than those provisions of this Agreement that explicitly continue in effect after the termination of the Relationship.

9.    **Representations and Covenants.**

(a)    **Facilitation of Agreement.**  I agree to execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon Cerebral's written request to do so.

(b)    **No Conflicts.**  I represent that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship. I will not disclose to Cerebral or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party. I will not induce Cerebral to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party. I acknowledge and agree that I have listed on Exhibit 1 all agreements (*e.g.,* non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with Cerebral or my ability to recruit or engage customers or service providers on behalf of Cerebral, or otherwise relate to or restrict my ability to perform my duties for Cerebral or any obligation I may have to Cerebral. I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

(c)    **Voluntary Execution.**  I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

10.    **Electronic Delivery.**  Nothing herein is intended to imply a right to participate in any of Cerebral's equity incentive plans, however, if I do participate in such plan(s), Cerebral may, in its sole discretion, decide to deliver any documents related to my participation in Cerebral's equity incentive plan(s) by electronic means or to request my consent to participate in such plan(s) by electronic means. I hereby consent to receive such documents by electronic delivery and agree, if applicable, to participate in such plan(s) through an on-line or electronic system established and maintained by Cerebral or a third party designated by Cerebral.

11.    **Miscellaneous.**

(a)    **Governing Law.**  The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California, without giving effect to the principles of conflict of laws.

(b)    **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding between Cerebral and me relating to its subject matter and merges all prior discussions between us. No amendment to this Agreement will be effective unless in writing signed by both parties to

this Agreement. Cerebral shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of Cerebral, it being understood that, even if I am an officer of Cerebral, I will not have authority to give any such authorizations or waivers for Cerebral under this Agreement without specific approval by the Board of Directors. Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

      (c)    **Successors and Assigns**. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of Cerebral, its successors, and its assigns.

      (d)    **Notices**. Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in Cerebral's books and records.

      (e)    **Severability**. If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected. Cerebral and I have attempted to limit my right to use, maintain and disclose Cerebral's Confidential Information, and to limit my right to solicit employees and customers only to the extent necessary to protect Cerebral from unfair competition. Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 7 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.

      (f)    **Remedies**. I acknowledge and agree that violation of this Agreement by me may cause Cerebral irreparable harm, and therefore I agree that Cerebral will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a one-thousand dollar ($1,000) bond will be adequate), in addition to and without prejudice to any other rights or remedies that Cerebral may have for a breach of this Agreement.

      (g)    **Advice of Counsel**. I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

      (h)    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

**(Signature Page Follows)**

The parties have executed this Confidential Information and Invention Assignment Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**CEREBRAL, INC.:**

DocuSigned by:

*kyle Robertson*

F01A89C4E1641E4...

Kyle Robertson, CEO
**Cerebral, Inc.**

2/23/2021
_____
Date

Understood and Accepted:

DocuSigned by:

*Matthew Truebe*

252474B27BF14BO...

Matthew Truebe

2/19/2021
_____
Date

## EXHIBIT 1

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP
### EXCLUDED UNDER SECTION 3(a) AND CONFLICTING AGREEMENTS DISCLOSED
### UNDER SECTION 9(b)

The following is a list of (i) all Inventions that, as of the Effective Date: (A) I made, and/or (B) belong solely to me or belong to me jointly with others or in which I have an interest, and that relate in any way to any of Cerebral's actual or proposed businesses, products, services, or research and development, and which are not assigned to Cerebral and (ii) all agreements, if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with Cerebral or my ability to recruit or engage customers or service providers on behalf of Cerebral, or otherwise relate to or restrict my ability to perform my duties for Cerebral or any obligation I may have to Cerebral:

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

Except as indicated above on this Exhibit 1, I have no inventions, improvements or original works to disclose pursuant to Section 3(a) of this Agreement and no agreements to disclose pursuant to Section 9(b) of this Agreement.

____ Additional sheets attached

Signature of Employee: _Matthew Truebe_

Print Name of Employee:  Matthew Truebe

Date: 2/19/2021

DocuSign Envelope ID: 12A04FA8-A0F4-463D-A9E6-B73D3D4E8D59

EXHIBIT 2

## CALIFORNIA LABOR CODE

Section 2870 of the California Labor Code is as follows:

(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

DocuSign Envelope ID: 12A04FA8-A9E4-463D-A956-B73D3D4E8D59

## EXHIBIT 3

## TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Cerebral, Inc., a Delaware corporation, its subsidiaries, affiliates, successors or assigns (collectively, "Cerebral").

I further certify that I have complied with all the terms of Cerebral's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any Inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement, and I acknowledge my continuing obligations under that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of Cerebral or any of its employees, clients, consultants or licensees.

Further, I agree that I shall not use any Confidential Information of Cerebral to negatively influence any of Cerebral's clients or customers from purchasing Cerebral products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of Cerebral.

Date:

**EMPLOYEE:**

Matthew Truebe

DocuSigned by:

*Matthew Truebe*

252474D276F14BD...

(Signature)

**EX. A - 65**

# Exhibit 2

## Amendment to Employment Offer Letter

This Amendment to the Employment Offer ("Amendment") is entered into as of January 14, 2022 ("Effective Date") by and between Cerebral Inc. ("Cerebral") and Matthew Truebe ("Mr. Truebe" or "you") (each a "Party" and collectively, the "Parties").

WHEREAS, the Parties entered into that certain Employment Offer Letter on February 23, 2021 regarding Mr. Truebe's employment at Cerebral ("Offer Letter"); and

WHEREAS, the Parties desire to amend the Offer Letter in accordance with the terms and conditions set forth in this Amendment;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to amend the terms of the Offer Letter as follows:

Section 1.  The following sentence in the third paragraph of the Offer Letter:

*In addition, Cerebral will grant you an incentive stock option (the "Option") to purchase **246,822** shares of Cerebral's common stock. These shares shall vest over four (4) years beginning with twenty-five percent (25%) vested on the one (1) year anniversary of the commencement of your employment (i.e., 1-year cliff) and monthly thereafter.*

Shall be, and hereby is, amended and replaced in its entirety as follows:

*In addition, Cerebral will grant you an incentive stock option (the "Option") to purchase **125,000** shares of Cerebral's common stock. These shares shall vest over four (4) years  beginning with twenty-five percent (25%) vested on the one (1) year anniversary of the commencement of your employment (i.e., 1-year cliff) and monthly thereafter.*

Section 2.  The following provisions shall be added after the third paragraph of the Offer Letter:

Cerebral agrees that from the Effective Date of this Amendment, you shall not be terminated without Cause (as defined below) by Cerebral through February 17, 2022. Following February 17, 2022, your employment remains at-will and nothing in this Agreement shall be interpreted to be in conflict with or to eliminate or modify in any way your at-will employment status.

*For purposes of this Agreement,* "Cause" means (i) your failure to substantially perform your material duties and obligations as an employee (for reasons other than death or Disability (as defined in the Cerebral's 2020 Equity Incentive Plan)), which failure is not cured to the sole and reasonable satisfaction of Cerebral; (ii) your failure or refusal to comply with the policies, standards and regulations established by the Cerebral from time to time, which failure is not cured to the sole and reasonable satisfaction of Cerebral; (iii) any act of personal dishonesty, moral turpitude, fraud, embezzlement, misrepresentation, or other unlawful act committed by you that results in harm to Cerebral or its affiliates, including financial or reputational, which harm shall be determined in Cerebral's sole and reasonable discretion; (iv) your violation of a federal or state law or regulation applicable to the business of Cerebral or its affiliates; (v) your being convicted of, or entering a plea of nolo contendere or guilty to, a felony under the laws of the United States or its equivalent in the jurisdiction in which the act that constituted the felony occurred; or (vi) your material breach of the terms of your option agreement or any other agreement between you and Cerebral (or any affiliate of Cerebral). With respect to (i) and (ii) above only, you shall have ten days to cure following written notice of your failure or refusal to perform or comply, provided that whether the failure is curable shall be within Cerebral's sole and reasonable discretion.

Exhibit 2
Ex. A - 67

DocuSign Envelope ID: 55DA8342-79CE-447A-9B0B-799CA1656976

Notwithstanding the foregoing, if within forty-five (45) days from the Effective Date of this Amendment, Kyle Robertson, the Chief Executive Officer of Cerebral (the "**CEO**"), in his sole discretion, personally requests in writing that you resume the full duties of leading the product and engineering functions at Cerebral as the most senior member of such functions reporting directly to the CEO on a long-term or permanent basis ("**Executive Duties**"), which, for the avoidance of doubt, shall not be triggered by the mere termination of any other individual leading the product and/or engineering functions, including any individual who is more senior or with a title more senior than your title, then you will be issued a new stock option grant to purchase 121,822 shares of Cerebral's common stock (the "**New Option**") commensurate with the increased responsibilities of fulfilling the Executive Duties. The New Option will have an exercise price equal to the fair market value on the date it is granted, as determined by Cerebral's Board of Directors. The New Option vesting start date shall be the date that you formally resume the Executive Duties as memorialized in a written amendment to your Offer Letter signed by you and Cerebral, and the New Option shall vest in equal monthly tranches over 4 years, with a 12-month cliff. The New Option will be memorialized in a separate written agreement at the time of the grant and will be issued pursuant to and subject to the terms of Cerebral's stock option or other incentive award plan as then in effect.

Section 3. In addition, you hereby agree as follows:

1. **Confidentiality and CIIA Obligations.** You agree and reaffirm your obligations to abide by the confidentiality obligations in your Offer Letter and provisions of that certain Confidential Information and Invention Assignment Agreement, entered into by you and Cerebral on February 23, 2021 (the "**CIIA Agreement**"), including Section 2 (Confidential Information) and Section 7 (Other Parties) of the CIIA Agreement.

2. **Non-Solicitation.** You agree and reaffirm that during the term of your employment with Cerebral, and for a period of two (2) years immediately following the termination of your employment with Cerebral for any reason, whether with or without Cause, you shall not, directly or indirectly, solicit any of Cerebral's employees, independent contractors or consultants to terminate their relationship with Cerebral, or attempt to solicit employees, independent contractors or consultants of Cerebral, either for yourself or for any other person or entity.

3. **Non-Disparagement.** You agree that during the term of your employment with Cerebral and at any time thereafter, you shall not disparage or encourage or induce others to disparage (i) Cerebral or its current or future subsidiaries, affiliates, successors or assigns ("**Affiliates**"), (ii) any of Cerebral's or its Affiliates' respective employees that were employed during your employment with Cerebral, or (iii) any of Cerebral's or its Affiliates' respective past and present, officers, directors, products or services ((i)-(iii), collectively, the "**Cerebral Parties**"). For purposes of this paragraph, the term "disparage" includes, without limitation, making or publishing any statement or other content, whether in written, oral, electronic, digital or other form, truthful or otherwise, including but not limited to comments or statements to the press, to Cerebral's or its Affiliates' employees or to any individual or entity with whom the Cerebral or its Affiliates has a business relationship (including, without limitation, any vendor, supplier, customer or distributor), or any public statement, that in each case is intended to, or can be reasonably expected to, adversely affect the public image, reputation, respect or goodwill of any of the Cerebral Parties. These covenants apply to, without limitation, making or publishing any such statements or other content in books, magazines and any other hard copy or paper document and in any electronic communication or form, including but not limited to, on blogs and microblogs (such as Twitter), personal websites and web pages, social and professional networking sites (such as Facebook or LinkedIn), message boards, discussion forums, wikis and other interactive sites, social bookmarking services (such as Digg), and video and other content sharing sites (such as YouTube). Notwithstanding the foregoing, nothing in this paragraph shall prevent you from making any truthful statement to the extent, but only to the extent (A) necessary with respect to any litigation, arbitration or mediation involving this Amendment or your Offer Letter, including, but not limited to, the enforcement of this Amendment or your Offer Letter, in the forum in which such

DocuSign Envelope ID: 55DA8342-79CE-4474-9B0B-799CA1656976

litigation, arbitration or mediation properly takes place or (B) required by law, legal process or by any court, arbitrator, mediator or administrative or legislative body (including any committee thereof) with apparent jurisdiction over you.

4.     You acknowledge and agree that your violation of this Amendment, Offer Letter or CIIA Agreement may cause Cerebral irreparable harm, and therefore you agree that Cerebral will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security, in addition to and without prejudice to any other rights or remedies that Cerebral may have for a breach of this Amendment, Offer Letter or CIIA Agreement.

All other terms of Offer Letter shall remain the same.

Sincerely,

Cerebral Inc.

DocuSigned by:

*kyle Robertson*

EB1A89C4E1614E4...

Name: Kyle Robertson
Title: CEO

Understood and Agreed

By: Employee

Matthew Truebe

EX. A - 69